MIGUEL C. GODREAU DUFFAU, ET AL., ETC., Plaintiffs and Appellees, *v.* TREASURER OF PUERTO RICO, Defendant and Appellant.

No. 10822. Argued May 5, 1953.—Decided December 7, 1954.

532

*José Trías Monge* (*J. B. Fernández Badillo, Acting Attorney General,* in the brief) and *J. C. Santiago Matos, Assistant Attorney General,* for appellant. *Leopoldo Tormes García* for appellees.

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

Godreau, Godreau & Cía., a sociedad, dissolved and distributed its assets—principally the Central Caribe—to its former members in proportionate shares. Thereafter all the former members individually joined in a deed selling Central Caribe for $625,000.00 to Central Aguirre Sugar Company, hereinafter referred to as Aguirre. The Treasurer notified the former members of the sociedad of a deficiency in its income tax. The theory of the Treasurer was that the sale had been made in substance by the sociedad prior to its dissolution rather than by the individual former members subsequent to dissolution. Consequently, according to the Treasurer, the sociedad was required to pay income tax on $324,750.08, the alleged gain resulting to the sociedad from the sale. After a trial on the merits, the former Tax Court entered a judgment in favor of the taxpayers. The case is here on appeal by the Treasurer from that judgment.

The question presented is whether the case is controlled by *Comm'r* v. *Court Holding Co.*, 324 U.S. 331, or by *U. S.* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451. In the *Court Holding Co.* case, a corporation negotiated the terms of the sale of an apartment house, its sole asset, with the purchaser. *An oral agreement was reached as to the terms and conditions*

*of sale.* At a meeting of the parties to reduce the agreement to writing, the corporation's attorney advised the purchaser that the sale could not be consummated because it would result in the imposition of a large income tax on the corporation. The next day the corporation declared a "liquidating dividend", which involved complete liquidation of its assets, and the apartment house was deeded to the corporation's two stockholders. A contract was drawn between the two former stockholders and the purchaser which embodied substantially the same terms and conditions previously agreed upon for the sale of the apartment house. *One thousand dollars, which had been previously paid to the corporation by the purchaser, was applied in part payment of the purchase price.* Three days later, the property was conveyed to the purchaser.

The Supreme Court of the United States disposed of the case in the following language at pp. 333–4:

"The Tax Court concluded from these facts that, despite the declaration of a 'liquidating dividend' followed by the transfers of legal title, the corporation had not abandoned the sales negotiations; that these were mere formalities designed 'to make the transaction appear to be other than what it was' in order to avoid tax liability. The Circuit Court of Appeals drawing different inferences from the record, held that the corporation had 'called off' the sale, and treated the stockholders' sale as unrelated to the prior negotiations.

"There was evidence to support the findings of the Tax Court, and its findings must therefore be accepted by the courts. *Dobson* v. *Commissioner*, 320 U.S. 489; *Commissioner* v. *Heininger*, 320 U.S. 467; *Commissioner* v. *Scottish American Investment Co.*, 323 U.S. 119. On the basis of these findings, the Tax Court was justified in attributing the gain from the sale to respondent corporation. The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the

534

consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

"It is urged that respondent corporation never executed a written agreement, and that an oral agreement to sell land cannot be enforced in Florida because of the Statute of Frauds, Comp. Gen. Laws of Florida, 1927, vol. 3, § 5779. But the fact that respondent corporation itself never executed a written contract is unimportant, since the Tax Court found from the facts of the entire transaction that the executed sale was in substance the sale of the corporation. The decision of the Circuit Court of Appeals is reversed, and that of the Tax Court affirmed."

There was considerable criticism of the language and result in the *Court Holding Co.* case.[1] And the Court undertook to clarify its views in the *Cumberland Public Service Co.* case. There a corporation, realizing that it must get out of business, offered to sell its stock to a cooperative. The cooperative refused to buy the stock, but offered to buy the corporation's physical assets. *The corporation rejected the offer because it would have been compelled to pay a heavy capital gains tax.* At the same time the shareholders, desiring to save payment of the corporate capital gains tax, offered to acquire the physical assets from the corporation and then sell them to the cooperative. The latter accepted.

[1] Magill, *Sales of Corporate Stock or Assets*, 47 Col. L. Rev. 707; Holzman, *Commissioner v. Court Holding Company Who Makes the Sale?*, 27 Taxes 538; Emery *Liquidation Distributions by Corporations Preceding Sale of Assets*, 27 Taxes 1057; Seghers, *Purchase and Sale of a Business or its Assets*, 26 Taxes 1165; King, *Sale of Stock or Purchase of Assets*, 4 tax. L. Rev. 378; Freeland, *Recent Trends in the Court Holding Company Principle*, Seventh Annual Institute on Federal Taxation, N.Y.U. 369; Beck, *Newer Methods Designed to Avoid the Court Holding Company Problem. Does a Case Like Westover v. Smith Eliminate the Court Holding Company Problem?*, Eighth Annual Institute on Federal Taxation, N.Y.U. 955; Bierman, *Corporate Distributions of Appreciated and Depreciated Property: Gain or Loss to the Distributor, Id.*, 792; Note 63 Harv. L. Rev. 483.

The corporation transferred its physical assets to its shareholders in partial liquidation. The remaining assets were sold and the corporation dissolved. *The shareholders then executed the previously contemplated sale to the cooperative.*

A suit to recover the tax imposed on the corporation was, brought in the Court of Claims which ultimately reached the Supreme Court of the United States. The latter disposed of the case at pp. 453–6 as follows:

". . . The Court of Claims found that the method by which the stockholders disposed of the properties was avowedly chosen in order to reduce taxes, but that the liquidation and dissolution genuinely ended the corporation's activities and existence. The court also found that at no time did the corporation plan to make the sale itself. Accordingly it found as a fact that the sale was made by the shareholders rather than the corporation, and entered judgment for respondent. One judge dissented, believing that our opinion in *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, required a finding that the sale had been made by the corporation. Certiorari was granted, 338 U.S. 846, to clear up doubts arising out of the *Court Holding Co.* case.

"Our *Court Holding Co.* decision rested on findings of fact by the Tax Court that a sale had been made and gains realized by the taxpayer corporation. There the corporation had negotiated for sale of its assets and had reached an oral agreement of sale. When the tax consequences of the corporate sale were belatedly recognized, the corporation purported to 'call off' the sale at the last minute and distributed the physical properties in kind to the stockholders. They promptly conveyed these properties to the same persons who had negotiated with the corporation. The terms of purchase were substantially those of the previous oral agreement. One thousand dollars already paid to the corporation was applied as part payment of the purchase price. The Tax Court found that the corporation never really abandoned its sales negotiations, that it never did dissolve and that the sole purpose of the so-called liquidation was to disguise a corporate sale through use of mere formalisms in order to avoid tax liability. The Circuit Court of Appeals took a different view of the evidence. In this Court the Government contended that whether a liquidation distribution was genuine or merely a sham was traditionally a question of fact.

We agreed with this contention, and reinstated the Tax Court's findings and judgment. Discussing the evidence which supported the findings of fact, we went on to say that 'the incidence of taxation depends upon the substance of a transaction' regardless of 'mere formalisms,' and that taxes on a corporate sale cannot be avoided by using the shareholders as a 'conduit through which to pass title.'

"This language does not mean that a corporation can be taxed even when the sale has been made by its stockholders following a genuine liquidation and dissolution. While the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes. The corporate tax is thus aimed primarily at the profits of a going concern. This is true despite the fact that gains realized from corporate sales are taxed, perhaps to prevent tax evasions, even where the cash proceeds are at once distributed in liquidation. But Congress has imposed no tax on liquidating distributions in kind or on dissolution, whatever may be the motive for such liquidation. Consequently, a corporation may liquidate or dissolve without subjecting itself to the corporate gains tax, even though a primary motive is to avoid the burden of corporate taxation.

"Here, on the basis of adequate subsidiary findings, the Court of Claims has found that the sale in question was made by the stockholders rather than the corporation. The Government's argument that the shareholders acted as a mere 'conduit' for a sale by respondent corporation must fall before this finding. The subsidiary finding that a major motive of the shareholders was to reduce taxes does not bar this conclusion. Whatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes.

"The oddities in tax consequences that emerge from the tax provisions here controlling appear to be inherent in the present tax pattern. For a corporation is taxed if it sells all its physical properties and distributes the cash proceeds as liquidating dividends, yet is not taxed if that property is distributed in kind and is then sold by the shareholders. In both

instances the interest of the shareholders in the business has been transferred to the purchaser. Again, if these stockholders had succeeded in their original effort to sell all their stock, their interest would have been transferred to the purchasers just as effectively. Yet on such a transaction the corporation would have realized no taxable gain.

. "Congress having determined that different tax consequences shall flow from different methods by which the shareholders of a closely held corporation may dispose of corporate property, we accept its mandate. It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs. Here as in the *Court Holding Co.* case we accept the ultimate findings of fact of the trial tribunal...." [2]

. The problem here is to determine whether under the facts of this case, in the light of the two foregoing Supreme Court cases, the sale of Central Caribe to Aguirre was in substance made by the sociedad prior to its dissolution, resulting in a taxable gain of $324,750.08 to the sociedad; or, on the contrary, whether the sale was in fact made by the former members of the sociedad after the dissolution of the latter, with the consequence that there was no taxable gain to the sociedad.

The formal documents in the case support the position of the taxpayers that the sale was made after dissolution by the former members, and not by the sociedad prior to dissolution. The minute book of the sociedad discloses that at a meeting held on June 14, 1946 the Board of Members

---

[2] The effect of the *Cumberland Public Service Co.* case on the *Court Holding Co.* case is discussed in Gutkin and Beck, *Sale of Assets Received in Liquidation,* 28 Taxes 328; Molloy, *Some Tax Aspects of Corporate Distributions in Kind,* 6 Tax L. Rev. 57, 65—6; Carson, *Relations between the Corporation and its Stockholders,* 30 Taxes 551, 558; Cary, *The Effect of Taxation on Selling Out a Corporate Business for Cash,* 45 Ill. L. Rev. 423, 430–8; 2 Mertens, *Law of Federal Income Taxation,* 1954 Supp., pp. 386–95; 1 Rabkin and Johnson, *Federal Income, Gift and Estate Taxation,* pp. 2328–36; 3 Federal Tax Service, Prentice-Hall, 1953, pp. 28, 220 *et seq.;* Riehm, *Federal Taxation Perspective During the Fifth Decade,* 52 Mich. L. Rev. 941, 953; 36 Va. L. Rev. 399.

unanimously agreed to make a request of the Public Service Commission that the sociedad be permitted to surrender the franchise issued to it under Act No. 221, Laws of Puerto Rico, 1942, as a public utility to grind sugar cane, and that as soon as possible thereafter, the Board be reconvened in order to take the pertinent action looking to the dissolution of the sociedad. On September 23, 1946, at the annual meeting of the Board of Members, the latter were advised that on August 15, 1946 the Commission had authorized the sociedad to cease its activities as a public utility and to surrender its franchise to grind cane. The Board thereupon unanimously approved a resolution that since the principal purpose for which the sociedad was created had ceased to exist, the sociedad should be dissolved and its assets distributed to the members in proportionate shares. This was in accordance with the provision in the original deed establishing the sociedad that it could be dissolved only by unanimous agreement of all the members.

On October 8, 1946 a deed of dissolution of the sociedad was signed by all its members declaring the sociedad dissolved as of that date. The deed adjudicated to the members their proportionate shares in the assets of the sociedad, including Central Caribe. On October 15, 1946 the former members of the sociedad joined in a deed in which each of them sold his share in Central Caribe to Aguirre for proportionate prices which totalled $625,000.00.

The Treasurer asserts, however, that these formal documents do not reflect what actually took place. And he complains of the manner in which the Tax Court weighed— or failed to take into account—the evidence in the case other than the formal documents. He asserts that the Tax Court erred (1) in finding that there was no evidence that the sociedad ever made any effort to sell the central to Aguirre,

and (2) in not giving any effect to certain documentary evidence which, according to the Treasury, showed that the sale had been substantially agreed upon by the parties prior to dissolution of the sociedad.

The Treasury relied on certain letters. The first was a letter of July 2, 1946 in which Lic. Tormes wrote counsel for Aguirre that he was sending him a memorandum that he had "...prepared as to the persons who are members of the sociedad, Godreau, Godreau & Cía, owner of the Central Caribe located at Salinas, so that you can be copying data for when the time arrives to sign the documents for the sale of the factory belonging to the said sociedad, bearing in mind the provisions of the deed creating the sociedad." This letter also stated that the Public Service Commission had set July 29, 1946 as the date for the hearing on the petition of the sociedad for authority to terminate its business of grinding cane.

The second letter, dated September 13, 1946, was likewise from Lic. Tormes to counsel for Aguirre. In it he indicated he was enclosing a certified copy of a deed showing that the sociedad owned the land on which Central Caribe was located. He also stated that "It would be desirable that we have a meeting, Mr. Rosaly, and the representatives of Central Aguirre Sugar Co., you, and the representatives of the Messrs. Godreau and I, in order to finish the matters relating to the documentation to be drawn up and the payment by the Central Aguirre Sugar Co. to the Messrs. Godreau of the sale price of the said Central." (It should be noted parenthetically that the record shows that due to conflicting engagements this meeting was never held).

The third item is correspondence late in September of 1946 between Aguirre and a dealer in machinery indicating that Aguirre had agreed to take over certain materials, which

had been previously ordered by the sociedad but had not yet been delivered by the supplier. The Treasurer also relies on the fact that between September 23 and 26, 1946 Aguirre bought the parts inventory owned by the sociedad from the latter.

The former Tax Court found as a fact that the sale was made after dissolution by the former members of the sociedad, and not prior thereto by the sociedad itself. We are unable to agree that the documentary evidence on which the Treasurer relies requires us to set aside this finding of fact. Lic. Tormes testified that his letters were written on behalf of individual members and not on behalf of the sociedad. He, accountants, attorneys, administrators, members of the sociedad, and representatives of Aguirre all uniformly testified that the negotiations which culminated in the sale took place between the date of the dissolution and the execution of the deed of sale. The former Tax Court apparently believed this testimony. The letters from Lic. Tormes at the most show that there were some preliminary negotiations prior to the dissolution. But they do not necessarily contradict his oral testimony that he was acting on behalf of an individual member, and not the sociedad.

The other evidence relied on by the Treasurer—the correspondence as to orders from suppliers and the purchase of the parts inventory by Aguirre—is equally inconclusive. These steps could conceivably have been taken by Aguirre (1) either to obtain such materials for its other centrals during the war period when supplies were hard to obtain (2) or in the hope of ultimately purchasing Central Caribe from the former members of the sociedad. In the same way, the fact that the sociedad had its franchise to grind cane cancelled is not a decisive factor here. This was a necessary step prior to dissolution. But the fact that the sociedad was already taking steps leading to its dissolution in July,

1946 does not necessarily constitute evidence both that it had decided to sell Central Caribe and that it had agreed upon such a sale to Aguirre. It follows that there is nothing in the record which would enable us to set aside the finding of fact that there were no negotiations on behalf of the sociedad for sale of Central Caribe to Aguirre.

Moreover, even if we assume—as the Treasury contends and contrary to the finding of fact of the former Tax Court —that prior to its dissolution either the sociedad had negotiated for the sale of the central to Aguirre or under the circumstances the negotiations by individual members must be attributed to the sociedad, the sale herein was not in substance by the sociedad under the test laid down in the *Court Holding Co.* case as clarified by the *Cumberland Public Service Co.* case. Under those cases the sale is atributed to the corporation for income tax purposes if there is "...a liquidation of the corporation *after a sale of its assets has been made or agreed upon*, in an attempt to shift the gain on the sale from the corporation to the individual stockholders." *Gilman* v. *Commissioner*, 14 T.C. 833, 841 (1950) (Italics ours); *Doyle Hosiery Corporation* v. *Commissioner*, 17 T.C. 641 (1951); *Oahu Beach & Country Homes, Ltd.* v. *Commissioner* 17 T.C. 1472 (1952); *St. Louis Union Trust Co.*, v. *Finnegan*, 197 F.2d 565 (C.A. 8, 1952); *Herbert* v. *Riddel*, 103 F.Supp. 369 (*Dist.Ct.*, 1952); *Burley Tobacco Warehouse* v. *Glenn*, 106 F.Supp. 949 (Dist.Ct., Ky., 1952). The documents herein show no such agreement or sale. As already noted, the letters from Lic. Tormes—even if attributed to the sociedad—show at the most preliminary negotiations. There is nothing in them—or the conduct of the parties—which demonstrates that a deal had been made as to purchase price, method of payment, and other conditions of sale prior to dissolution of the sociedad. On the contrary, the record affirmatively shows that agreement as to such

matters was reached by negotiations in which the individual former members engaged with representatives of Aguirre subsequent to dissolution of the sociedad. [3] Accordingly, we cannot interfere with the finding of fact that the sale here followed the dissolution of the sociedad. And the principle announced in the *Cumberland Public Service Co.* case at p.455 is controlling: *"Whatever the motive* and however relevant it may be in determining whether the transaction was real or a sham, *sales* of physical property by shareholders *following a genuine liquidation distribution* cannot be attributed to the corporation for tax purposes." (Italics ours). [4]

The judgment of the former Tax Court will be affirmed.

Mr. Justice Belaval concurs in the result.

---

[3] The purchase price of $625,000.00 and the manner of payment, including a considerable number of installment notes bearing four per cent interest, are found in the deed of sale. Another important provision of the deal, although not written into the deed of sale, was that none of the former members of the sociedad would engage in the business of grinding cane for 15 years, thereby assuring Aguirre it would obtain what it was really seeking in this transaction—the right to grind at its other mills the cane grown both by the former members and by the colonos of Central Caribe. The testimony shows that these terms were finally negotiated and agreed upon subsequent to the dissolution during two days prior to execution of the deed of sale on October 15, 1946.

[4] *Cf* § 337(a) of the Federal Internal Revenue Code of 1954. Under this Section, according to Rabkin and Johnson, *supra*, pp. 41–43: "Under prior law, the sale of assets by a corporation followed by a liquidation of the corporation produced two taxable events, with resulting double taxation where both the corporation and the stockholders realized gain. To avoid the double tax, these transactions took the form of a corporate liquidation followed by a sale of the assets by the stockholders. It was often difficult even in these latter cases to insure against double taxation, assuming no practical difficulties stood in the way of a liquidation prior to sale. The new Code provides a definitive rule which equates post-liquidation and pre-liquidation sales. As a general rule, if a corporation adopts a plan of liquidation after June 22, 1954, and within 12 months after the adoption of the plan all of its assets (except assets retained to meet claims) are distributed in complete liquidation, then no gain or loss will be recognized to such corporation from the sale or exchange by it of its 'property' within such 12-month period. ... "